UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:22-mc-80139-AMC

UNITES STATES OF AMERICA,

    Claimant,

V.

BOCA VIEW CONDOMINIUM ASSOCIATION, INC.;
DIANA KUKA, PRESIDENT;
ROSE WATKINS, ADMINISTRATOR;
POINTE MANAGEMENT GROUP, INC.; AND
ERIC ESTEBANEZ, PROPERTY MANAGER;

    Respondents.
_____/

**RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO THE UNITED STATES' PETITION TO ENFORCE HUD SUBPOENAS OR, IN THE ALTERNATIVE, MOTION TO DISMISS PETITION OR MOTION TO QUASH SUBPOENAS <u>FOR LACK OF JURISDICTION</u>**

Respondents, BOCA VIEW CONDOMINIUM ASSOCIATION, INC., ("Association"); DIANA KUKA ("President"); ROSE WATKINS, ("Administrator"); POINTE MANAGEMENT GROUP, INC., ("Pointe Management"); and ERIC ESTEBANEZ ("Manager") by and through their undersigned counsel, and in the matter of the United States of America's Petition to Enforce HUD Subpoenas related to GRETA TREMMEL's ("Complainant") HUD Complaint, requests that for the reasons more fully set forth below, the Government's Petition should be denied because the HUD Subpoenas improperly seek to compel disclosure of (i) confidential information and (ii) seeks documentation that is wholly irrelevant to the pending investigation.

**Part I – Relevant Background**

Boca View Condominium Association, Inc., is the entity responsible for operating Boca View, a Condominium. The property is located at 1000 Spanish River Road, Boca Raton, Palm

Beach County, Florida, 33444.  The community is comprised of one four-story building.  This is a condominium governed by Chapter 718, Florida Statutes.  The Association is governed by the Declaration of Condominium, the Bylaws and Articles of Incorporation, with amendments thereto, which are recorded in the Official Records of Broward County, Florida. The Association is also governed by its Rules and Regulations. These governing documents are enforced by the Association's Board of Directors. As a condominium, the Association is governed by The Condominium Act, Florida Statute Chapter 718.

During the COVID-19 global pandemic, and to protect the safety and health of all residents the Board, exercising its broad emergency powers afforded to it by Florida law, enacted additional restrictions related to non-essential visitors, use of the amenities, leases and moving in and out of the property.

The Complainant alleges that she attempted to rent her condominium – Unit 1B – in Boca View Condominium to the alleged "Aggrieved Party", Jennifer Piraino, an ICU nurse ("lessee"). Complainant alleges that the sole grounds for the Association refusing to process lessee's application was because lessee is an ICU nurse.  That is simply untrue.  There was a moratorium on all leases and lessee's occupation, whether a nurse or office worker, would have resulted in the same action. Yet, even if taken in the light most favorable to the Complainant, to what protected class under the Fair Housing Act does the Complainant, by virtue of her ICU nurse employment, belong to? Interestingly, although the Government's Petition references it, that filing fails to attach Complainant's Original Complaint submitted to HUD. Further, although the Petition identifies the Parties to this action (at ¶¶ 1 to 6), same makes no attempt at detailing the Complainant's standing or her alleged disability despite attaching the Association's numerous requests to identify same.

Instead the Petition misconstrues the Association's position and completely ignores the Association's requests to overcome the Complainant's lack of standing.

The lease application was submitted late in the day on Friday, April 24, 2020. The lease was to begin on May 1, 2020. That would have left the Association with four (4) business days to review the application, conduct all the necessary background screenings and conduct an interview. This would not have been possible had there not been a global pandemic. Moreover, the application was incomplete. There was no information submitted concerning the co-occupant of the unit. Realizing the Association was not permitting leases, and without any consideration of the applicant's occupation, the Administrator returned the incomplete application on the next business day, so the potential lessee could make necessary arrangements.

The application never made its way to the Board of Directors because of the moratorium on leasing. As such, the Board directed its management to return the incomplete lease application, on the next business day, without review.

This decision by the Association was made in response to the newly declared global pandemic. On March 9, 2020, Florida Governor Ron DeSantis declared a state of emergency in response to confirmed COVID-19 cases in Florida. On March 13, 2020, former U.S. President Donald Trump declared a National Emergency. Numerous units of local government around the nation have enacted similar proclamations. The number of coronavirus cases in Florida had increased tremendously and a significant number of those cases were in Palm Beach County. The World Health Organization (WHO) declared COVID-19 a worldwide pandemic; and Palm Beach County declared emergency conditions.

Specifically, on March 29, 2020, Palm County issued EO-2020-003 which was a "Stay Home, Stay Safe – Safer at Home" Policy. This order advised residents of Palm Beach County

that beaches, parks, pools and other facilities were closed and to stay home, with very limited exceptions, such as engaging in acts that are critical to the safety and health of one's self or another person, obtaining necessary supplies and to engage in "minimum activities" necessary to conduct "Minimum Basic Operations".

The Governor of Florida began the Phase I reopening, by Order dated April 29, 2020, which became effective on May 4, 2020. (See EO-20-112). On May 14, 2020, EO-20-123, dated May 14, 2020, with an effective date of May 18, 2020, was issued which opened restaurants, gyms, sporting facilities, amusement parks, etc. It was at this time, and in compliance with the above orders, as well as Palm Beach EO-2020-002a which was repealed on May 22, 2020, that Boca View began to reopen to non-essential workers and permitted people to move into the building and began to review and consider new leases. All of the actions and restrictions the Association implemented between March 2020 and May 2020, were in full compliance with federal, state and local emergency orders governing the global pandemic.

### Part II– The Global Pandemic, Applicable Executive Orders and the Board of Directors' Broad Emergency Powers

Condominium Associations[1], and their Boards of Directors, were faced with unparalleled situations with the only guidance being the recommendations of the Center for Disease Control, the Florida Department of Health, and local public health agencies and other governmental agencies. Amongst the issues the Associations were faced with are the following:

1. Can we cancel or postpone scheduled board or owner meetings?
2. If we have meetings, can we prohibit in person attendance (for example prohibit unit owners from attending board meetings)?
3. Can we restrict (require gloves, masks, etc.) or ban association contractors from entering the property?

---

[1] Condominiums were and are affected more than many other types of communities, especially those that are not open-air and have shared facilities, such as elevators, mail, and laundry rooms. Boca View is such an indoor Condominium with shared air-conditioned internal hallways, a lobby, elevators, laundry facilities and a mail room.

4. Can we restrict or ban owner contractors from entering the property?
5. Can we restrict or ban guests (day visitors, out of town guests, etc.) from entering the property?
6. Can we restrict or ban renters from entering the community?
7. Can we shut down recreational and other common facilities?
8. Can we engage in physical screening of people entering the property as a condition of entry?
9. If we have a confirmed case of infection of a resident, can we publish that information to other residents?

To answer these questions, we must review Florida's statutory scheme addressing condominiums.

Section 718.1265 of the Florida Condominium Act reads, in part, as follows:

> 718.1265 Association emergency powers. —
>
> (1) To the extent allowed by law and unless specifically prohibited by the declaration of condominium, the articles, or the bylaws of an association, and consistent with the provisions of s. 617.0830, the board of administration, **in response to damage caused by an event for which a state of emergency is declared** pursuant to s. 252.36 in the locale in which the condominium is located, may, but is not required to, exercise the following powers:
>
> (f) **Implement a disaster plan** before or immediately following the event for which a state of emergency is declared which may include, but is not limited to, shutting down or off elevators; electricity; water, sewer, or security systems; or air conditioners.
>
> (g) **Based upon advice of emergency management officials or upon the advice of licensed professionals retained by the board, determine any portion of the condominium property unavailable for entry or occupancy by unit owners, family members, tenants, guests, agents, or invitees to protect the health, safety, or welfare of such persons.**
>
> (h) Require the evacuation of the condominium property in the event of a mandatory evacuation order in the locale in which the condominium is located. Should any unit owner or other occupant of a condominium fail or refuse to evacuate the condominium property where the board has required evacuation, the association shall be immune from liability or injury to persons or property arising from such failure or refusal.
>
> (i) **Based upon advice of emergency management officials or upon the advice of licensed professionals retained by the board, determine whether the condominium property can be safely inhabited or occupied.** However,

such determination is not conclusive as to any determination of habitability pursuant to the declaration…

(2) The special powers authorized under subsection (1) shall be limited to that time reasonably necessary to protect the health, safety, and welfare of the association and the unit owners and the unit owners' family members, tenants, guests, agents, or invitees and shall be reasonably necessary to mitigate further damage and make emergency repairs. (Emphasis added).

The statute contemplates broad and extraordinary emergency powers in response to "damage" for which a state of emergency has been declared. The statute broadly applies to situations where a state of emergency has been declared, which is applicable here. The reference to "damage" is not limited to property damage and it applies to the potential spread of COVID-19.

Of note, on March 13, 2020, the Division Director for the Division of Florida Condominiums requested the Co-Chair of the Florida Bar Condominium Committee to advise Florida residents, including practicing attorneys, that it was the Division's position that FS 718.1265 should be applied to the current situation.

Further, there is strong support in the case law affording deference to the "business judgment" of a board. In fact, quoting from a recent decision released by the Third District Court of Appeal on March 18, 2020, the Court stated:

> Generally, Florida courts have extended business-judgment deference to common interest associations "if [a] decision is within the scope of the association's authority and is reasonable–that is, not arbitrary, capricious, or in bad faith." *Miller v. Homeland Prop. Owners Ass'n, Inc.*, 284 So. 3d 534, 537 (Fla. 4th DCA 2019) (quoting H*ollywood Towers Condo. Ass'n, Inc. v. Hampton*, 40 So. 3d 784, 787 (Fla. 4th DCA 2010)); see also *Garcia v. Crescent Plaza Condo. Ass'n, Inc.*, 813 So. 2d 975, 978 (Fla. 2d DCA 2002) ("[T]he 'business judgment rule' protects the Association's board of directors when making business decisions in good faith.") (citation omitted). The question of reasonableness under the business judgment rule is an issue of fact. *Miller*, 284 So. 3d at 537 (citation omitted).
>
> If an association pleads that an association's decision is both authorized by its governing documents and reasonable, its "business decision should not be

> fodder for in-depth ex post legal scrutiny." *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.20 (11th Cir. 1989) (citation omitted). "Courts have properly decided to give directors a wide latitude in the management of the affairs of a corporation provided always that judgment, and that means an honest, unbiased judgment, is reasonably exercised by them." *Otis & Co. v. Pa. R. Co.*, 61 F. Supp. 905, 911 (E.D. Pa. 1945). "The business judgment rule is a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges." *Int'l Ins. Co.,* 874 F.2d at 1158 n.20.

*Royal Harbour Yacht Club Marina Condominium Ass'n, Inc., v. Maresma, 304 So.3d 1268* (Fla. 3d DCA 2020).

The emergency powers granted to the Association, in conjunction with the business judgment rule, enable it to take whatever precautions are necessary to protect the residents of the community, including, but not limited to, shutting down and/or closing any portion of the condominium property that is not essential. Restricting or banning guests. Restricting sales and leasing. Restricting non-essential personnel. The governmental protocol for the coronavirus/ COVID-19 pandemic requires social distancing and highly encourages avoiding contact with others and those protocols had only gotten more severe as the virus spread.

Unprecedented conditions, such as COVID-19, called for unprecedented responses. The Association implemented restrictions during the pandemic to prevent the spread of the virus. The Board disseminated communications encouraging residents to help one another, while being mindful of social distancing. The Board banned non-essential personnel, while still allowing medical providers, food delivery, maintenance and pest control services, medical deliveries, and emergency repairs. The Board distributed and posted around the building literature to the residents explaining proper protocols to prevent the spread of the virus. The Board required that residents wear masks throughout the common areas, including in elevators. They encouraged social distancing. The Board also provided its residents with the City of Boca Raton's Emergency

CASE NO: 9:22-mc-80139-AMC

Declaration stating that restaurants were closed except for drive through, take-out or delivery services. The Board closed the amenities such as the gym and pool. These were actions taken by most responsible Boards of Directors during the pandemic, and during the government-imposed lockdowns and curfews.

During the height of the global pandemic and the period of government-imposed lockdown, an applicant submitted an application to lease Complainant's unit. The Board, using its best business judgment and emergency powers, enacted a moratorium on leasing and anyone moving into the building to avoid exposure to COVID-19 and therefore, the spread of the disease. No leases were approved and no one moved in the building between mid-March 2020 and mid-June 2020, at the earliest.

### Part III – Memorandum of Law and Grounds for Protective Order

As the Department of Justice has acknowledged to Congress, when enforcing an administrative subpoena, "the district court's role is not that of a mere rubber stamp, but of an independent reviewing authority called upon to insure the integrity of the proceeding" and the review is "designed to provide a meaningful day in court for one resisting an administrative subpoena." DOJ Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities, (2002), available at http://www.justice.gov/archive/olp/rpt_to_congress.htm (quoting Wearly v. FTC, 616 F.2d 662, 665 (3rd Cir. 1980) and United States v. Security State Bank and Trust, 473 F.2d 638, 642 (5th Cir. 1973)).

Administrative agencies' investigative powers are analogous to a grand jury in that an agency can investigate on a mere suspicion the law is being violated. *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950); *EEOC v. Children's Hosp. Med. Ctr. of N. Cal.*, 719 F.2d 1426,

1428-29 (9th Cir.1983), abrogated on other grounds by *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991). When seeking judicial enforcement of an administrative subpoena, **the agency bears the initial burden of proof.** (emphasis added). See *SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512, 514 (10th Cir. 1980), *cert. denied*, *Drizin v. SEC*, 449 U.S. 955 (1980). To meet this burden, the agency must show: (1) the inquiry is within the agency's authority; (2) the information sought is reasonably relevant to the inquiry; (3) the demand is not too indefinite; and (4) the administrative prerequisites have been satisfied. *Martin v. Gard*, 811 F. Supp. 616, 620 (D. Kan. 1993) (citing <u>United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950)</u>; *see also Blackfoot Bituminous, Inc.*, 622 F.2d at 514.

Once the agency makes this showing, the court will enforce the subpoena unless the respondent can show: (1) "the subpoena is overly broad or burdensome" *Martin*, 811 F. Supp. at 620 (citing *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 475–76 (4th Cir. 1986)). ; or (2) "that enforcement would constitute an abuse of [] process." *Id.* (citing *United States v. Wilson*, 864 F.2d 1219, 1222 (5th Cir. 1989)). An abuse of process is established only upon a showing of bad faith. *Id.* (citing *United States v. Powell*, 379 U.S. 48, 58 (1964)).

HUD has not identified that the documentation requested is within its authority to request. Moreover, HUD cannot demonstrate that the information sought is reasonably relevant to the inquiry. This will be established *infra*. HUD is also unable to demonstrate that the demand is not indefinite as evidenced below. HUD cannot demonstrate that the administrative prerequisites have been satisfied.

Each Respondent is entitled to a protective order as to each of the five (5) identical Subpoenas Duces Tecum served upon each Respondent, through counsel. Each of the Subpoenas in question requests the following information:

CASE NO: 9:22-mc-80139-AMC

You are hereby directed to provide the following:

1. Provide a copy of all rental and sales applications for all dwelling units in Boca View Condominium submitted, approved, or denied from March 1, 2020 – November 23, 2020.

2. Provide any documents or communications relating to the rental and sales applications referenced in item 1, above, including decisions regarding the processing of those applications from March 1, 2020 – November 23, 2020$^2$.

3. Provide minutes of executive board, full board and membership meetings for January 1, 2020 – November 23, 2020.

**A. HUD Lacks Authority to Investigate the Instant Complaint Because There is No Identified Disabled Individual and HUD is Grasping at Straws in an Attempt to Find Discrimination Where None Occurred and There is Only One (1) Individual Allegation of Discrimination.**

The Respondents are each entitled to an Order Denying the Government's Petition to Enforce HUD Subpoenas prohibiting the Disclosure of the Association's documents as requested above. The federal and Florida Fair Housing Acts state, in relevant part that it is unlawful to discriminate against a person in the use of his or her property because of a handicap. To establish a claim of discrimination, a Fair Housing Amendments Act (FHAA) plaintiff must demonstrate that (1) she suffers from a handicap as defined by the Act; (2) defendant knew or reasonably should have known of the plaintiff's handicap; (3) and Defendant took action, or failed to take action, based on the disability. *Budnick v. Town of Carefree,* 518 F.3d 1109 (9th Cir. 2008).

For purposes of analyzing this request, Complainant is a Unit Owner who attempted to **lease**$^3$ her unit during a moratorium on leasing based upon a global, deadly pandemic. Complainant

---

$^2$ As outlined in the Petition (at ¶ 21), this period of time is also a moving target as HUD on January 8, 2021 enlarged the "relevant" period to be from March 1, 2020 to January 8, 2021. It stands to reason that, the "relevant period" may be extended to a later date HUD decides to issue a new request for the Association's records.

$^3$ The Complaint (which is not attached to the Petition) does not in any way address sales of units which is completely different from a lease. A lease applicant expects to move into a Unit within a specified timeframe. In the case at hand, the applicant expected to move into a unit in less than one week from her application submittal. An owner, on the other hand, can purchase a unit but not move in until the moratorium on moving in and out of the building is lifted.

does not claim to be disabled, instead, she claims that the potential lessee is disabled. There is nothing in the application, nothing in the complaint or any other evidence that the potential lessee is disabled. The complaint uses the term "perceived as" disabled as if the Complainant possessed mind-reading software or a device. Again, that is not the case. No one perceived the potential lessee to be disabled and no proof to the contrary has ever been shown, nor could it be. The Board of Directors determined that it was in the best interests of the residents to place a moratorium on leasing to protect its residents from exposure to the deadly virus. Accordingly, the potential lessee is not disabled and is not part of a protected class, nor did the Association believe she was. The Board's decision not to process the application was based upon the moratorium on leasing and for no other reason. Accordingly, Complainant cannot establish a *prima facie* case of discrimination.

Complainant attempts to conflate the ban on leasing with the fact that the potential lessee is a nurse. That flies in the face of the fact that the Board allows medical professionals to enter the building to care for residents so long as CDC Guidelines are being observed. Moreover, and as Complainant is aware, there is at least one other nurse in residence. The Board did not review the application at issue and was unaware the applicant was a nurse. The moratorium on all leases was the sole motivating factor in the Board's return of the application package. The Board never acted in a discriminatory manner. The moratorium was applied to all equally.

This is further buttressed by the fact that when Respondents requested that the investigator disclose who the disabled person in question is or was in relation to this Complaint, Mr. Reginald Malden, by email dated November 20, 2020, advised that:

> Note: that the Act provides standing to those persons who are associated with persons with a handicap. (In this event Covid-19 patients). If further clarification is needed, I will have to refer you to our Office of General Counsel. (emphasis added by Mr. Malden).

Respondents were advised that Complainant was a person who is "associated with persons with a handicap" – COVID 19 patients. However, Ms. Tremmel is not associated with any COVID-19 patients. She happens to know someone who is a nurse who may – or may not – come in contact with COVID-19 patients. This "aggrieved person" status fails as it is too attenuated to identify any disabled person and even if the applicant was primarily associated with COVID-19 patients, which she admittedly is not, Tremmel certainly was not. The bottom line is there is no disabled person and there is no one associated with an identified disabled person.

The Board of Directors, using its business judgment and emergency powers, for the sole purpose of protecting its residents and carry out its fiduciary duties, enacted a moratorium on leasing. This was not an action based upon a discriminatory motive. This Board should be complemented for diligently trying to protect its residents in the face of a deadly global pandemic. The allegations are a slap in the face to those who volunteer their time and talents to operate the condominium and seek to protect its residents. As stated above, these are unprecedented times that required unprecedented actions. The actions undertaken were not discriminatory.

Further, the Tenth Circuit Court of Appeals recently rejected a similar argument as HUD is making for investigation-broadening subpoenas as here, finding that "a single discriminatory act does not, by itself, warrant a broader pattern-or-practice investigation." *E.E.O.C. v. TriCore Reference Labs.,* 849 F.3d 929 (10th Cir. 2017) (rejecting the notion that an employer's alleged individual act of discrimination entitled the Commission to evidence that "could be part of a pattern or practice of discrimination") (citing *E.E.O.C. v. Burlington N. Santa Fe R.R.,* 669 F.3d 1154, 1157-58 (10th Cir. 2012) (holding that while "[a]ny act of discrimination could be part of a pattern or practice of discrimination . . . not every charge of discrimination warrants a pattern or practice investigation.")).

Based on the foregoing, HUD lacks authority to even investigate the Complainant's attenuated allegations, - which hinge largely on whether the nurse may encounter a Covid-19 patient, admittedly a rarity in and of itself- because there is nothing more than one (1) "alleged individual act of discrimination".

Realizing the difficult decisions that had to be made during this crisis, Florida's Governor signed into legislation Florida Statute Section 768.38 which is designed to "head-off" frivolous lawsuits[4] in order to protect Florida's economy and get Florida back to work. The statute provides, in relevant part:

> 768.38 Liability protections for COVID-19-related claims.—
>
> (1) The Legislature finds that the COVID-19 outbreak in this state threatens the continued viability of certain business entities, educational institutions, governmental entities, and religious institutions that contribute to the overall well-being of this state. The threat of unknown and potentially unbounded liability to such businesses, entities, and institutions, in the wake of a pandemic that has already left many of these businesses, entities, and institutions vulnerable, has created an overpowering public necessity to provide an immediate and remedial legislative solution. Therefore, the Legislature intends for certain business entities, educational institutions, governmental entities, and religious institutions to enjoy heightened legal protections against liability as a result of the COVID-19 pandemic. The Legislature also finds that there are no alternative means to meet this public necessity, especially in light of the sudden, unprecedented nature of the COVID-19 pandemic. The Legislature finds the public interest as a whole is best served by providing relief to these businesses, entities, and institutions so that they may remain viable and continue to contribute to this state.

This statute expressly applies to not-for-profit corporations, such as the Association, to protect them from frivolous claims related to the global pandemic, such as the claim by Tremmel who is seeking to enrich herself by $40,000. At a time when the government ordered a statewide

---

[4] During a recent campaign for the election of the Directors for the Association's Board, the Complainant, Tremmel, unsuccessfully campaigned against the sitting Board and, in e-mails to the community, claimed that she may expect to take home around $40,000 from her frivolous complaint. She may have hoped that unseating the current Directors would create an easier path for her to enrich herself by $40,000.

shutdown and lockdown of businesses, restaurants, bars, night clubs, churches and places of worship, schools and college campuses, libraries, parks, beaches, hotels, theme parks, and short term rentals, it seems a moratorium on leasing, in the height of a deadly, global pandemic, in one of the counties most affected by the pandemic, is exactly what should have been done. Complainant should not be encouraged to try to take advantage of a global pandemic by asserting a frivolous complaint based on disability when there is **no** disabled party. The above statute should prevent this complaint from proceeding. Further, HUD failed to demonstrate that this complaint and the subpoenas at issue are within HUD's authority to investigate. The complaint should not have been accepted to begin with because it was not properly vetted at intake and therefore, fails to demonstrate that the administrative prerequisites were satisfied. A cursory review would have clearly shown there is no disabled person involved in this case and no one perceived to be disabled. Furthermore, the Complaint lacks any allegations beyond one (1) "alleged individual act of discrimination" These subpoenas should not have been issued because they violate all four of the prongs mentioned above and therefore, the Government's Petition should be denied.

HUD has failed to establish a prima facie case of discrimination which is a prerequisite to enforcing an administrative subpoena. This case has been a moving target for nearly two years with no one from HUD having any idea who is allegedly disabled, whether the Association even knew the nurse's occupation, or whether COVID played a part in the moratorium on leasing. Simply put – this is not a case of discrimination and there is not a shred of evidence to support the claim. This is HUD's "fishing expedition" to hope it can find some shred of evidence to somehow find the Association discriminated. This point is underscored by the fact that HUD is seeking documents well outside the relevant time period. Why would it matter if the Association approved a tenant in November 2020 when the moratorium, admittedly, was months before? Why would

HUD be seeking documentation related to sales when the moratorium was on leasing – or better stated – the ban was on people moving in and out of the building during the height of the pandemic. People can purchase a unit if they agreed not to move in during the moratorium. A lease does not work that way.

The Association advised HUD on numerous occasions that the Board of Directors never even saw the application to lease the unit. The management company was advised to return the application because of the moratorium. Just because Ms. Tremmel makes an unfounded allegation does not make it true. It is no secret that there are two factions in this building and the faction that does not support the Board of Directors has filed numerous HUD complaints, DBPR complaints, municipal complaints, and lawsuits. The Association prevails in each of these claims – to the faction's dismay – because there has been no wrongdoing. This is yet another of this faction's latest attempts to disparage the Board of Directors with their incendiary allegations which have no basis in fact.

HUD should be trying to determine the veracity of Tremmel and her friend's allegations against the Association and the Board of Directors. HUD is supposed to be an unbiased and neutral party that investigates the allegations of the Petitioner, as well as the defenses the Respondent asserts. That is not, and has not been, what occurred in this investigation. It is obvious from the actions taken thus far in this investigation, that HUD has nothing to support Tremmel's claims and is hoping a "fishing expedition" will somehow reveal a fact that will help support its premeditated decision that the Association discriminated against Tremmel. Not a single fact will be unearthed to support this position.

Accordingly, HUD has failed to establish a prima facie case of discrimination and the Government's Petition to Enforce the Subpoenas should be denied as to all Respondents. HUD

did not address this issue in its Order denying the Association's Motion for Protective Order and Motion to Quash.

### B. Respondents Object to the Subpoenas Because They Are Overbroad in Time and Scope.

The Subpoenas at issue seek Association documents related to all sales and leases from March 21, 2020, to November 23, 2020, and documents and communications related to all sale and lease applications during the same time period, in addition to Board Minutes from January 2020 to November 23, 2020. These requests are not reasonably relevant to this complaint and they are too indefinite. As stated above, the relevant timeframe is mid-March through mid-June, at which time, the Board of Directors complied with state and local governmental orders addressing the closing and re-opening of facilities, including condominium buildings, under Phase I of Florida's plan. Accordingly, HUD is on a fishing expedition in attempting to review sale and lease applications on or after June, 2020 as the Association admittedly began approving leases again in June and/or July 2020 in compliance with state and local Executive Orders. All leases the Association addressed after mid-June 2020 are irrelevant to Tremmel's frivolous claim. Moreover, HUD is now requesting information related to sales which are completely irrelevant.[5] As explained above, no one was permitted to move in and out of the building during the moratorium. If someone wanted to purchase and agreed not to move in until the moratorium was lifted, a sale could go through. <u>Sales are wholly irrelevant</u>.

---

[5] Mr. Malden's initial request was for documents related to leases. For some reason, once the Association questioned Tremmel's standing to file this complaint, HUD decided to broaden its investigation and sought all sales *and* lease information. HUD has not acted as a neutral party in investigating this complaint. Instead, HUD has made it abundantly clear that it is acting as Tremmel's representative and will leave no rock unturned until discriminatory conduct is unearthed.

With regard to request number 2 requesting documents and communications concerning the sales and leases, the request is overbroad and indefinite.  HUD never identifies the parties to the communications it is seeking, many of which are likely undiscoverable based upon the attorney-client privilege.  Documentation regarding sales is wholly irrelevant for the reasons stated above.  The timeframe is overly broad based upon the argument above. This subpoena is overbroad in time and scope and the Government's Petition should be denied as to all Respondents.

As to request number 3, it is unclear why HUD is requesting minutes of Board Meetings at all.  There would be no reason HUD is entitled to minutes as it relates to this completely unfounded claim of one (1) "alleged individual act of discrimination" that should have been dismissed at its inception.  HUD is again in search of something to try to find that these Respondents somehow acted in a discriminatory fashion.  The minutes are irrelevant to this frivolous claim of discrimination.  Moreover, the timeframe was unilaterally expanded from what should have been roughly two to three months to just shy of one year.  Accordingly, the Government's Petition to Enforce HUD Subpoenas should be denied as to all Respondents.

### C. The Requested Documents Belong to the Association and Not Any of the Other Respondents.

The documents requested are records of the Association.  The President of the Association, Diana Kuka, is not in possession of these documents.  Pointe Management acts at the direction of the Association, as do its employees, Eric Estebanez and Rose Watkins.  These individuals do not have the authority to turn over Association documents.  Accordingly, the Petition to Enforce HUD Subpoenas as to these Respondents should be denied.  HUD is acting outside its authority to try to obtain documents from those who are not permitted to disclose them.

**D. Florida Law Prohibits the Association From Turning over Documentation Obtained As Part of a Lease or Sale.**

The Association objects to the production of the requested documents based upon Florida Statute § 718.111(12), stating that the Association is not permitted to disclose any "information obtained by an association in connection with the approval of the lease, sale, or other transfer of a unit" which includes applicants' personal and private information such as Social Security numbers, credit history and background checks, all of which require "Personally Identifiable Information Protection" (PIIP) and implicate "rights-to-privacy" arguments. HUD argues that the statute only applies to owners and not to HUD. This is a misstatement of the law. The only people entitled to inspect the Association's official records are owners of a unit who are members and, thus, shareholders of the corporation. No one else can make a request to inspect the Association's records. The fact is, even owners are prohibited from seeing these documents. Therefore, HUD has no ability to obtain these documents. Again, sales are not part of this complaint so that is a further basis to deny the production of these documents, as well as the dubious timeframe. Furthermore, all individuals who apply to reside at Boca View have an expectation of privacy. They have granted access only to the Association and have authorized only its management company to conduct background checks. Accordingly, the Petition to Enforce HUD Subpoenas should be denied.

## Part V – Conclusion

All respondents are entitled to a denial of the Government's Petition to Enforce HUD Subpoenas. The requests are **not** within HUD's authority; they are not reasonably relevant; they are too indefinite and the administrative prerequisites have not been satisfied. To allow these subpoenas to stand is an abuse of process. The requests are overly broad and burdensome as demonstrated above. HUD should have to precisely identify the alleged "disabled" person or the

alleged disability in this scenario so that the Association may properly defend itself against these claims.

WHEREFORE, Respondents seek an Order Denying the United States of America's Petition to Enforce HUD Subpoenas as to the 5 identical subpoenas issued in this case, for an award of fees and costs and for such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 15, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

> BECKER & POLIAKOFF, P.A.
> *Attorneys for Respondent*
> 121 Alhambra Plaza, 10th Floor
> Coral Gables, FL  33134
> 305/262-4433 Fax: 305/442-2232
> ACervera@beckerlawyers.com
> MJimenez@beckerlawyers.com
>
> By: _____
> Adam Cervera, Esq.
> Florida Bar No. 81679